2016 IL App (2d) 150634
No. 2-15-0634
Opinion filed July 20, 2016

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 14-DT-247 |
| AARON TAYLOR, | ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Burke and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Aaron Taylor, was arrested for driving under the influence (DUI) with a

blood alcohol concentration (BAC) of 0.08 or more. 625 ILCS 5/11-501(a)(1) (West 2014). The

trial court suppressed defendant's portable breath test (PBT) results. The court explained that

section 11-501.5(a) of the Illinois Vehicle Code (PBT statute) requires an officer, acting under

reasonable suspicion, to "request" a suspect to submit to a PBT, and that the officer here, Paul

Delisio, did not so request. 625 ILCS 5/11-501.5(a) (West 2014). Additionally, the court, citing

*People v. Rozela*, 345 Ill. App. 3d 217, 224 (2003), explained that the PBT statute requires a

suspect's consent prior to administering a PBT, and that defendant here did not so consent. 625

ILCS 5/11-501.5(a) (West 2014). The court then quashed the arrest, stating that, absent the PBT results, there was not probable cause to arrest defendant for DUI.

¶ 2 The State raises two issues. First, it challenges the trial court's suppression of the PBT results, arguing that the trial court should not have relied on *Rozela* for the proposition that the PBT statute requires consent. The State contends that, per *People v. Gutierrez*, 2015 IL App (3d) 140194, ¶ 20, which was released after the court's ruling in the instant case, *Rozela* is no longer good law. We disagree, and determine that *Rozela* is still good law, though we take the opportunity to clarify its use of the word consent. Thus, we hold that the court did not err in suppressing the PBT results.

¶ 3 Alternatively, the State argues that, even absent the PBT results, there was probable cause to arrest for DUI. The State likens this case to *People v. Rush*, 319 Ill. App. 3d 34 (2001), where the appellate court reversed the trial court's finding of no probable cause. We find *Rush* distinguishable, and we reject the State's probable-cause argument.

¶ 4                                    I. BACKGROUND

¶ 5 The record contains transcripts of both the hearing on defendant's petition to rescind the summary suspension of his license and the hearing on defendant's motion to suppress evidence and quash his arrest. The squad car video was submitted at both hearings. The transcripts of the hearing on the petition to rescind were accepted at the hearing on the motion to suppress evidence and quash the arrest. This appeal concerns the trial court's ruling on the motion to suppress evidence and quash the arrest.

¶ 6                               A. Defendant's Driving

¶ 7 The squad car video began recording at 2:55 a.m. Delisio turned onto the road on which defendant was driving and began to follow defendant. Defendant, age 28, had just rolled through

a three-way stop sign or light.[1]   Delisio followed defendant, down the straight road, for one minute.  Defendant approached a stoplight, which was red.  Defendant turned right after slowing down to a roll.  About 40 seconds later, defendant approached another stoplight.  Defendant turned left.  The light was green, though it turned to yellow before defendant was through the turn.  Delisio can be heard on the video saying, "wide turn."  Delisio testified, however, that the turn was not uncommonly wide and that defendant did not overcorrect for the turn.  Less than one minute later, defendant signaled and moved into the right lane.  Defendant passed a stop sign, with a slight roll.  He signaled and turned right.  As defendant passed a parked car, defendant slowed down from 28 to 21 miles per hour in a 30-mile-per-hour zone.  Approximately 10 seconds after reaching the low speed of 21 miles per hour, defendant signaled and pulled to the side of the road.  Delisio pulled up behind defendant but did not activate his squad lights.  Defendant then put on his flashers and waited in his truck for about 30 seconds.  Delisio remained in his squad car.  Defendant exited his truck, approached Delisio, and gave a slight hand wave.  At this point, Delisio treated the interaction as a "motorist assist."

¶ 8    Delisio asked defendant, "What's the problem?"  Defendant answered that he was trying to find Chicago Road.  He explained that it was his first time in the area and he was driving his friend home from a birthday celebration: "I just want to get my friend home safely."  (The friend remained in the truck for the entire encounter.)

¶ 9    Delisio asked defendant if he had been drinking.  (Delisio testified that defendant smelled of alcohol and had glassy and dilated eyes.)  Defendant stated that he had had three or four beers,

---

[1] The event that prompted Delisio to follow defendant is not captured on the video.  There is much confusion in the testimony and in the briefs as to whether defendant failed to stop at a sign or a light.  Either way, Delisio chose to follow defendant rather than detain him.

beginning around 6:30 p.m. He had not had anything to drink in the last 30 minutes. Delisio asked defendant to get his insurance card. Defendant cooperated. Delisio told defendant to get back into his truck, and, instead, defendant started to get into Delisio's squad car. Delisio asked defendant to participate in field sobriety tests. He told defendant that the purpose of the tests was to determine whether defendant could continue to drive home.

¶ 10                                B. HGN Test

¶ 11    Delisio testified that the Horizontal Gaze Nystagmus (HGN) test indicated that defendant had been drinking. According to Delisio, defendant leaned forward during the test. However, Delisio admitted that he did not administer the test correctly, in that he conducted the test near the flashing lights of defendant's truck. Delisio also admitted that he had not received training on the HGN test since 1999 and was not certain whether the speed at which he moved the light was in keeping with the current standards.

¶ 12                            C. Walk-and-Turn Test

¶ 13    Delisio told defendant to hold the heel-to-toe position while he gave the instructions. After Delisio gave the instructions, he asked, "Do you understand all that?" Defendant stated that he did and reverted to a relaxed pose. Delisio then told defendant to begin the test: "Alright, whenever you are ready." Defendant then resumed the heel-to-toe position and began the test.

¶ 14    Delisio testified that he deducted points when defendant reverted to the relaxed position. Delisio acknowledged that he never told defendant, as current standards required, that defendant must hold the position through the instructions and go straight into the test without taking a break. Delisio further admitted that his police report was incorrect where he checked a box indicating that defendant "lost his balance" during the instructions. Defendant did not lose his balance; defendant merely reverted to the relaxed pose.

- 4 -

¶ 15    After the walk-and-turn test, defendant said, "Officer, I'm not looking to cause any trouble."  Delisio said, "Oh, I know, but I gotta make sure you are okay to drive."  Defendant offered to call his parents, stating that they would be "more than happy" to pick him up.  Delisio nodded and said, "Okay, well…" and did not finish the sentence.  Defendant tried again, this time stating, "I'm probably borderline.  I'm not going to lie."  He stated that he did not want to be "in this position," and he again asked to call his parents.  Delisio responded that he would continue with the field tests and that "maybe" defendant would not have to call his parents.

¶ 16                         D. One-Legged-Stand Test

¶ 17    About halfway through the 30-second one-legged-stand test, defendant lost his balance. He swayed, hopped slightly, and raised his hands several inches, but he did not put down his foot.  Delisio deducted a point for each of these motions, though the motions occurred as part of a single loss of balance.  Delisio admitted that flashing lights can affect a person's balance and that he administered the test near the flashing lights of defendant's truck.

¶ 18                               E. PBT Test

¶ 19    At 3:10 a.m., Delisio retreated to his squad car to obtain the PBT device.  He told defendant to wait, but he did not tell defendant that a PBT test would be forthcoming.  As defendant waited, a loud train could be heard.  At 3:10:38, Delisio reappeared on the video and approached defendant.  At 3:10:41, Delisio held the PBT device within inches of defendant's chest.  With the train still passing, Delisio stated: "What I want you to do is take a deep breath and blow in here like you're blowing up a balloon, okay?"  He finished that sentence at 3:10:45. It is not clear from the video's head-on angle whether Delisio had already placed the PBT device *in* defendant's mouth at 3:10:45.  The PBT device was, at a minimum, within one or two inches of defendant's mouth.  It *is* clear from the video that the PBT device was in defendant's mouth

by 3:10:47, because defendant exhaled; he was blowing. Additionally, between 3:10:49 and 3:10:53, Delisio said, "keep going, keep going." Delisio read the PBT results, and, at 3:11:19, he arrested defendant for DUI.

¶ 20     Delisio testified at the hearing on the petition to rescind that he "didn't ask" defendant to take the PBT but that "it was all voluntary." Delisio stated that he stuck the stem of the PBT device into defendant's mouth and that defendant acquiesced in this action.

¶ 21                              F. Trial Court's Ruling

¶ 22     The trial court suppressed the PBT results, explaining that it did not believe that Delisio complied with the PBT statute:

> "[G]oing back to the testimony [at the hearing on the petition to rescind], the deputy indicated, 'I didn't ask him. It's voluntary,' and it's clear from the conversation that did occur and what was observed on the squad video that there was not a request to take the test and that [under] *People v. Rozela* *** it appears *** that under the circumstances I don't believe the driver consented. When you look at the totality of all the circumstances, what occurred, what was said and how it transpired the driver was not requested to provide a sample for the preliminary breath screening test on the portable device."

¶ 23     Without the PBT results, the trial court found no probable cause to arrest for DUI. It noted that Delisio's testimony was inconsistent. At the hearing on the petition to rescind, Delisio spoke of defendant's strong odor of alcohol. However, at the hearing on the motion to suppress evidence and quash the arrest, Delisio stated that he noticed "nothing unusual" about defendant as defendant got into the squad car.

¶ 24    As to defendant's driving, the court noted that Delisio followed defendant through several turns and stops, some of which defendant rolled through.  Defendant drove below the speed limit the entire time.  Then, defendant pulled over to the side of the road, signaling and turning on his flashers.  Delisio parked behind him but did not turn on his squad lights. Defendant walked toward Delisio to ask directions.  Defendant's slow speed was not concerning; it was "somewhat consistent" with defendant's initial statement that he was not familiar with the area.  Delisio initially treated the interaction as a motorist assist.

¶ 25    As to defendant's actions prior to the field tests, the trial court stated: "there's no observation of any problems with the driver's ability to get out of the truck or to walk." Defendant conversed without slurring or mumbling.  Defendant followed directions to go back to the truck to get his insurance card.  Again, he had no trouble walking between the vehicles and entering and exiting his truck.  Upon retrieving the insurance card, defendant started to get into the squad car, against Delisio's directions to get into the truck.  However, the trial court twice clarified that it was not convinced that defendant heard Delisio's directions: "but again, there's no indication as to what was heard."

¶ 26    As to the HGN test, the trial court discounted Delisio's testimony that defendant leaned forward during the test.  The court stated: "That's not observable *** not even slowly leaning forward or slightly leaning forward.  It's just not observable there."  The court also questioned the relevance of the HGN test to defendant, who had already admitted to drinking some amount of alcohol.

¶ 27    As to the walk-and-turn test, the trial court noted confusion over the instructions.  Delisio admitted that he gave improper instructions.  Delisio should not have deducted points where defendant's failings were due to poor instructions.  In light of the instructional errors,

defendant's performance was "satisfactory," with "no difficulties performing the test, no problems with swaying or balance or other issues as to that."

¶ 28    As to the one-legged-stand test, the trial court agreed with Delisio that defendant faltered. The court characterized defendant's movement as "a hop and a slight sway."

¶ 29    The trial court acknowledged that Delisio had been forthright in admitting that he improperly administered the HGN test and the walk-and-turn test.  However, the court concluded, "if there's mistakes in the instructions and mistakes in the administration of the tests, then they're not sufficiently reliable to make that informed decision as to whether or not to arrest defendant."

¶ 30    Thus, the trial court granted the motion to suppress evidence and quash the arrest.  This appeal followed.

¶ 31                              II. ANALYSIS

¶ 32    The State argues that the court misunderstood the requirements of the PBT statute and that this caused it to err in suppressing the PBT results.  Alternatively, the State argues that, even without the PBT results, Delisio had probable cause to arrest for DUI.  We review in two parts a motion to suppress evidence and quash an arrest based on an alleged lack of probable cause. *People v. Grant*, 2013 IL 112734, ¶ 12.  First, we review the trial court's factual determinations under the manifest-weight standard. *Id*.  Then, we review *de novo* the ultimate ruling on the motion. *Id*.

¶ 33                    A. Suppression of the PBT Results

¶ 34    The State challenges the trial court's interpretation of the PBT statute.  The court stated that the PBT statute requires an officer to request a PBT and that it requires a suspect's consent prior to administering the PBT.  In ruling, the court cited *Rozela*, 345 Ill. App. 3d at 224, which

states, "[the PBT statute] permits an officer to conduct a PBT only if: (1) the officer has reasonable suspicion that the suspect has committed DUI and (2) the suspect consents to the test." The State, citing *Gutierrez*, 2015 IL App (3d) 140194, asserts that the PBT statute does *not* require a suspect's consent. The State asks us to interpret the PBT statute and determine its requirements, considering *Rozela* and *Gutierrez*.

¶ 35    Our review of the requirements of the PBT statute is *de novo*. See *People v. Jones*, 214 Ill. 2d 187, 193 (2005). "The primary objective of statutory interpretation is to determine and give effect to the legislature's intent." *Id*. We first look to the language of the statute at issue. *Id*. "The statute should be read as a whole and construed so that no part of it is rendered meaningless or superfluous." *Id*. Where the legislature's intent is not clear from the statute's plain language, the court may turn to legislative history. *Id*. The PBT statute provides:

> "If a law enforcement officer has reasonable suspicion to believe that a person is violating or has violated Section 11-501 or a similar provision of a local ordinance, the officer, prior to an arrest, *may request* the person to provide a sample of his or her breath for a preliminary breath screening test using a portable device approved by the Department of State Police. The person *may refuse* the test. The results of this preliminary breath screening test may be used by the law enforcement officer for the purpose of assisting with the determination of whether to require a chemical test as authorized under Sections 11-501.1 and 11-501.2, and the appropriate type of test to request. Any chemical test authorized under Sections 11-501.1 and 11-501.2 may be requested by the officer regardless of the result of the preliminary breath screening test, if probable cause for an arrest exists. The result of a preliminary breath screening test may be used by the defendant as evidence in any administrative or court proceeding involving

a violation of Section 11-501 or 11-501.1." (Emphases added.) 625 ILCS 5/11-501.5(a) (West 2014).

¶ 36 The statutory language directs that, if there is reasonable suspicion, an officer "may request" a PBT, and the suspect "may refuse." *Id.* The relevant dictionary definition of "request" is "the act or an instance of asking for something." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/request (last visited June 2, 2016) (listed in the "full definition"). The relevant dictionary definition of "refuse" is "to show or express unwillingness to do or comply with." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/refuse (last visited June 2, 2016) (listed in the "full definition"). The relevant dictionary definitions of "may" are "have permission to," "be free to," and "ability to." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/may (last visited June 22, 2016) (the last of which is denoted by the source as archaic). The "request" and "refuse" elements of the PBT statute together describe the protocol the officer must follow prior to administering the test. The statutory use of the phrase "may refuse" denotes a choice, and the phrase would have no meaning if it did not signal that the suspect had the choice to take, or to refuse, the "requested" PBT. Thus, as we detail below, the request and refuse elements indicate that some level of consent or choice is implicit in the statutory language.[2]

---

[2] The word "consent" has special meaning within fourth-amendment law. Consent, as typically referenced in fourth-amendment cases, can serve as a stand-alone basis to satisfy the fourth amendment's requirement that all searches be reasonable. Here, however, when we say that the PBT statute requires some form of consent, we do not mean that the "may request" and "may refuse" protocol is *alone* sufficient to establish the reasonableness of the PBT search. Rather, as the statute expressly states, there must also be reasonable suspicion.

¶ 37     In *Rozela*, the defendant argued that the PBT statute was unconstitutional in that it allowed for a PBT to be conducted in the absence of probable cause.  This court rejected the defendant's argument.  *Rozela*, 345 Ill. App. 3d at 225.  The PBT statute did not violate a suspect's fourth-amendment right against unreasonable searches and seizures, because the PBT statute's "request" and "refuse" format provided for consent as a valid basis for the search.  *Id*. *Rozela* did not discuss what hypothetical circumstances might satisfy the PBT statute's consent requirement.  As was proper, it addressed only the circumstances presented, specifically, that the officer "asked" and the defendant "complied."  *Id*. at 221, 225.  Thus, the defendant's argument that the PBT statute was unconstitutional for failure to require probable cause failed.

¶ 38     *Gutierrez* involved a highly unusual fact pattern, wherein the defendant was a police officer who had been in a traffic accident and was asked by a supervisor to return to the scene. *Gutierrez*, 2015 IL App (3d) 140194, ¶ 5.  The defendant was asked to submit to a PBT, in the context of facing potential discipline should he refuse.  *Id*. ¶¶ 5-8.  After two device reading failures, the administering officer was able to successfully obtain a reading.  *Id*. ¶ 8.  There was no question that the administering officer requested the test and the defendant was given the opportunity to refuse.  Rather, the defendant argued that the PBT statute required his "informed consent"[3] before he submitted to the PBT, particularly where he faced the collateral pressure of potential discipline.  *Id*. ¶ 18.

---

[3] The *Gutierrez* court interchanged the terms "informed consent" and "affirmative consent."  However, it is clear from the context of the *Gutierrez* analysis that *Gutierrez*'s key ruling was that the PBT statute does not require "informed consent."  Thus, in discussing *Gutierrez*, we use only the term "informed consent."

¶ 39    The *Gutierrez* court rejected the defendant's argument.  It stated that the "request" and "refuse" elements of the PBT statute simply mean that an officer cannot command a suspect to take the PBT and that a suspect will not be penalized for refusing the PBT.  *Id*. ¶ 20.  It further stated that the suspect has "a right to refuse the PBT" and that a suspect must have the "ability to refuse" the PBT.  *Id*. ¶¶ 21-22.  However, it determined that the officer is *not* required to inform the suspect of his or her right or ability to refuse the PBT.  *Id*. ¶ 21.  Whether an officer is required to inform the suspect that he or she may refuse had been discussed and firmly rejected during the debate on the bill.  *Id*. (citing 91st Ill. Gen. Assem., Senate Proceedings, Feb. 25, 2000, at 62).  Thus, the court concluded, the legislature's purposeful decision not to require an officer to inform a suspect of his or her right to refuse evinced the legislature's intent that the officer need not obtain "informed consent" prior to administering the PBT.  *Id*.

¶ 40    Our agreement with *Gutierrez* is limited.  We agree with its holding that the PBT statute does not *require* a suspect's informed consent.  However, in reaching that holding, *Gutierrez* misread, and, thus, unnecessarily rejected, *Rozela*.  The flaw in *Gutierrez* is that it seized upon *Rozela*'s use of the word "consent" and elevated it to "informed consent."  Then, finding that the statute does not require informed consent, *Gutierrez* rejected *Rozela*.  However, as discussed, *Rozela* never held that the PBT statute requires "informed consent."  Rather, *Rozela* held that the PBT may be conducted on less than probable cause, *i.e.*, reasonable suspicion, where the request-and-refuse protocol has been satisfied.  *Rozela*, 345 Ill. App. 3d at 225.  Indeed, the purpose of the PBT is to aid in *determining* probable cause; the PBT results may be used by the State only to establish that the arresting officer had probable cause to arrest, not as evidence at a DUI trial.  *Id*. at 227.  In the absence of probable cause, the statute affords protection against unreasonable searches by requiring the request-and-refuse protocol to be conducted under reasonable

suspicion. *Id*. at 225. We read this protocol as requiring some form of consent before a PBT may be administered. *Id*. Thus, per *Rozela*, the PBT statute passes constitutional muster. *Id*.

¶ 41 Read together, *Rozela* and *Gutierrez* provide guidance as to what circumstances can satisfy the PBT statute's consent requirement. In *Rozela*, the officer "asked" the defendant to submit to the PBT, and the defendant "complied." *Id*. at 221. "There was no evidence that [the] defendant's submission to the test was involuntary." *Id*. In *Gutierrez*, even though the defendant faced collateral, disciplinary pressure to consent to the test, he had an opportunity to refuse and he chose not to avail himself of that opportunity. *Gutierrez*, 2015 IL App (1st) 140194, ¶ 22. We know that the defendant in *Gutierrez* had a period of time to refuse the PBT, because, after arriving at the scene and being asked to take the test, he had a conversation with another officer regarding his disciplinary status. Further, the test registered two unsuccessful readings before the third test registered a successful reading. *Id*. ¶ 8.

¶ 42 Thus, from *Rozela* and *Gutierrez*, we learn that the "may refuse" language does not oblige an officer to inform a suspect that he or she may refuse, but it does require that the suspect have a reasonable opportunity to refuse. Where a suspect voluntarily submits to the PBT upon request, the statute's request-and-refuse requirements have been met. In other words, so long as the officer requests the PBT without commanding submission, and so long as the suspect is given an opportunity to refuse, the PBT is voluntary. The PBT does not become involuntary because the suspect is not told that he or she may refuse or because the suspect ultimately was motivated by collateral pressures.

¶ 43 In this case, the trial court found that Delisio did not request that defendant take the PBT. It considered this fact when it determined that defendant did not consent as required under the PBT statute. Again, it stated:

"[G]oing back to the testimony [at the hearing on the petition to rescind], the deputy indicated, 'I didn't ask him. It's voluntary,' and it's clear from the conversation that did occur and what was observed on the squad video that there was not a request to take the test and that [under] *People v. Rozela* \*\*\*, it appears \*\*\* that under the circumstances I don't believe the driver consented. When you look at the totality of all the circumstances, what occurred, what was said and how it transpired the driver was not requested to provide a sample for the preliminary breath screening test on the portable device."

¶ 44    The trial court's finding that Delisio did not "request" that defendant take the PBT is supported by the evidence. Delisio testified that he did not request that defendant take the PBT: "I didn't ask him." Delisio told defendant: "What I want you to do is take a deep breath and blow in here like you're blowing up a balloon, okay?" The court reasonably interpreted the question—"okay?"—as asking defendant whether he understood the instructions, not as a request to take the test. Further, Delisio told defendant that he "want[ed]" defendant to submit to the PBT. This made it less likely that defendant would understand the instruction as a choice rather than a command. In contrast, where an officer "requests" that a suspect take the PBT, the suspect is presented with the choice as to whether to take or refuse the PBT (even if the suspect is not informed of the consequences of taking or refusing the PBT). Here, Delisio did not present that choice, and thus he affected defendant's opportunity to refuse the PBT.

¶ 45    The trial court's finding that defendant did not have an opportunity to refuse the PBT is also supported by the evidence. Defendant had *less* than two seconds, from 3:10:45, when Delisio finished the instruction, to 3:10:47, when defendant could be seen exhaling, to question whether the instruction could be a choice rather than a command. During that time, defendant

was surrounded by physical distractions, such as flashing lights, a loud train, and a PBT device held close to his face. The video shows that Delisio held the PBT device within inches of, if not directly against, defendant's mouth as he finished the instruction. Delisio placed the PBT device so close to defendant's mouth that defendant would have had difficulty refusing with mere words; defendant would have had to physically respond by turning his head, stepping backward, or placing his hand in front of his mouth in order to effectively communicate a refusal. Although a suspect *may* issue a nonverbal refusal, placing a suspect in a position where he must do so in order to effectively communicate with the officer is a factor that weighs heavily against the voluntariness of the search. An officer may not place the PBT device into a suspect's mouth without giving the suspect an opportunity to refuse.

¶ 46    In sum, we determine that, per *Rozela*, the PBT statute does require the suspect's consent, or choice, to take or to refuse to the test. The statute does not require informed consent. Here, in determining that defendant did not consent, the trial court considered in combination Delisio's failure to request that defendant take the PBT and his failure to provide an opportunity to refuse. Its findings were not against the manifest weight of the evidence. Thus, it properly suppressed the PBT results, due to noncompliance with the PBT statute.

¶ 47    Our above rationale is dispositive of the PBT issue. We need not address the remainder of the State's PBT arguments. In any case, many of the remaining cases cited by the State pertain to postarrest procedure and are, therefore, inapplicable to the PBT procedure conducted by an officer with reasonable suspicion and in furtherance of obtaining probable cause. See, *e.g.*, *Jones*, 214 Ill. 2d at 189 (postarrest procedure); *People v. Kavanaugh*, 362 Ill. App. 3d 690, 697 (2005) (specifically distinguishing the PBT statute's procedure from postarrest procedure).

¶ 48                    B. Probable Cause To Arrest Absent the PBT Results

¶ 49    The State next argues that, even if the PBT results were properly suppressed, Delisio had probable cause to arrest defendant for DUI.[4] An officer has probable cause to arrest if he knows facts that would lead a reasonably cautious person to believe that the arrestee has committed an offense. *Grant*, 2013 IL 112734, ¶ 11. Probable cause is based on common-sense probability, not proof beyond a reasonable doubt. *Id*. When assessing whether there was probable cause to arrest, the court should consider the totality of the circumstances, including the officer's law enforcement experience. *Id*.

¶ 50    Here, the trial court's factual determinations were not against the manifest weight of the evidence. We give deference to the court's assessment that Delisio's testimony was inconsistent, and, after watching the video, we accept the court's factual determinations. For example, the court reasonably determined that, although defendant might have committed traffic violations, these violations were minor. We also accept the court's determination that defendant walked and spoke normally during the interaction.

¶ 51    The trial court reasonably discounted the reliability of the HGN and walk-and-turn tests. As the court stated, "if there's mistakes in the instructions and mistakes in the administration of the tests, then they're not sufficiently reliable to make that informed decision as to whether or not to arrest defendant." The HGN test was administered in the presence of flashing lights, which was against protocol. We accept the court's determination that defendant did not lean forward during the test. The walk-and-turn test was also administered incorrectly. The record supports the court's determination that defendant should not have lost points for reverting to a

---

[4] The State does not alternatively argue that, if Delisio lacked probable cause to arrest defendant for DUI, the arrest nevertheless was valid because he had probable cause to arrest defendant for a different offense. Thus, we do not address any such argument.

relaxed stance before beginning the test. Delisio never told defendant to hold the heel-to-toe position through the beginning of the test. Defendant was instructed to hold the position while listening to the instructions. Defendant did not revert to a relaxed stance until after the instructions were complete, when Delisio asked, "Do you understand all that?" The record also supports the court's assessment that, about halfway through the 30-second one-legged-stand test, defendant moved with "a hop and a slight sway." However, defendant never put down his foot.

¶ 52    The State notes factors not stressed by the trial court, including that defendant can be heard on the video saying, "I'm probably borderline, I am not going to lie." Defendant made the statement after satisfactorily performing the walk-and-turn test and in the context of asking to call his parents. The trial court could have reasonably decided not to take defendant's statement at face value. It could have interpreted defendant's statement as a passive attempt to end his encounter with Delisio or, simply, as apprehension over additional field tests. Alternatively, it could have decided not to attribute much weight to the statement.

¶ 53    The State also notes that defendant had four beers over eight hours and had glassy, dilated eyes. We do not know for certain that the trial court believed Delisio's statement that defendant had glassy, dilated eyes; the court did not comment one way or the other. The court elsewhere pointed to inconsistencies in Delisio's testimony. In any case, these points do not render the court's overall factual determination against the manifest weight of the evidence. Defendant admitted to having four beers over eight hours, but defendant moved and spoke in an ordinary manner. Defendant took the HGN and walk-and-turn tests, but both of those tests were administered incorrectly and in the face of flashing lights. Defendant performed satisfactorily on the walk-and-turn test. Defendant faltered during the one-legged-stand test, but only "slight[ly]." These facts do not support probable cause to arrest for DUI.

¶ 54    The State likens this case to *Rush*, 319 Ill. App. 3d 34, where the appellate court reversed the trial court's finding of no probable cause to arrest the defendant for DUI.   In *Rush*, the defendant momentarily crossed the center line.  *Id*. at 39.  When stopped, the defendant was unaware that he had committed a traffic violation.  *Id*. at 36.  He smelled of alcohol and had slurred speech.  He admitted to drinking five or six beers.  *Id*.  He later admitted to drinking seven or eight beers.  *Id*. at 37.  He had an open can of beer in the seat beside him, and he was the only person in the vehicle.  *Id*. at 36.  The officer properly administered several field tests. *Id*.  During the walk-and-turn test, the defendant failed to touch his heels to his toes and also raised his arms for balance.  *Id*.   During the one-legged-stand test, the defendant put down his leg five times.  *Id*.  The defendant did not fail every test; for example, he was able to count backward from 80 to 60.  *Id*. at 37.  The defendant's PBT reading was 0.07.  *Id*.  (After his arrest, the defendant submitted to a chemical test that revealed a BAC of 0.11.  *Id*. at 35.)

¶ 55    *Rush* is distinguishable.  The defendant in *Rush* admitted to drinking as many as eight beers over a number of hours and, unlike defendant here, had an open can of beer in the seat beside him, had slurred speech, submitted to properly administered field tests, undisputedly failed several of those tests (*e.g.*, putting his foot down five times), and had a concerning PBT result.   In contrast, our defendant had four beers over eight hours but moved and conversed normally, and, per the trial court's factual determination, faltered slightly on only one test. Again, these facts do not support probable cause to arrest for DUI.

¶ 56                                III. CONCLUSION

¶ 57    For the aforementioned reasons, we affirm the trial court's judgment.

¶ 58    Affirmed.